| | | |
|---|---|---|
| **TAMALITHA JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:15CV594NCC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision

of the Commissioner denying the applications of Tamalitha Jones (Plaintiff) for Disability

Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et

seq., and for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42

U.S.C. §§ 1381 et seq. Plaintiff has filed a brief in support of the Complaint. (Doc. 14).

Defendant has filed a brief in support of the Answer. (Doc. 17). The parties have consented to

the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. §

636(c). (Doc. 9).

## I.
## PROCEDURAL HISTORY

On April 4, 2012, Plaintiff filed her applications for DIB and SSI, alleging a disability

onset date of April 1, 2012. (Tr. 10, 109-21). Plaintiff's applications were denied, and she

requested a hearing before an Administrative Law Judge (ALJ). (Tr. 68-72, 83-85). After a

hearing, by decision, dated July October 1, 2013, the ALJ found Plaintiff not disabled. (Tr. 10-

17).  February 4, 2015, the Appeals Council denied Plaintiff's request for review.  (Tr. 1-6).  As such, the ALJ's decision stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled.  20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits.  20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities."  Id.  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations.  20 C.F.R. §§ 416.920(d), 404.1520(d).  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  Id.

Fourth, the impairment must prevent the claimant from doing past relevant work.  20 C.F.R. §§ 416.920(f), 404.1520(f).  The burden rests with the claimant at this fourth step to

establish his or her Residual Functional Capacity (RFC). <u>Steed v. Astrue</u>, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. <u>Steed</u>, 524 F.3d at 874 n.3. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." <u>Id.</u> <u>See also</u> <u>Harris v. Barnhart</u>, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. <u>Clark v. Heckler</u>, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002). <u>See also</u> <u>Cox v. Astrue</u>, 495 F.3d 614, 617 (8th Cir. 2007).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. <u>Cox</u>, 495 F.3d at 617. Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001) (citing

McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Weighing the evidence is a function of the ALJ, who is the fact-finder.  Masterson v. Barnhart, 363 F.3d 731, 736 (8th Cir. 2004).  Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently.  Krogmeier, 294 F.3d at 1022.

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

## III.
## DISCUSSION

The issue before the Court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled.  Clark, 733 F.2d at 68.  Plaintiff, who was thirty-four years old on her alleged onset date, claimed she was disabled due to aortic valve

stenosis,[1] high blood pressure, shortness of breath, fatigue, a heart murmur, chest pain, and dizzy spells. (Tr. 150). At the administrative hearing, Plaintiff testified that she experienced chest pain "a lot"; that she had difficulty lifting things; that she had weakness, tiredness, and dizziness when she moved; that she had difficulty going up and down stairs; and that, when she took a shower, she became dizzy and tired and had to lie down before dressing herself. (Tr. 29-35).

The ALJ found that Plaintiff met the insured status requirements through September 30, 2015; that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 1, 2012; that Plaintiff had the severe impairment of aortic insufficiency; that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment; that Plaintiff had the RFC to perform sedentary work; that Plaintiff could not perform her past relevant work; that considering Plaintiff's RFC, age, education, and work experience, there were jobs, existing in significant numbers in the national economy, which Plaintiff could perform; and that, therefore, Plaintiff was not disabled.

Plaintiff contends that the ALJ's decision is not based on substantial evidence because: the ALJ did not develop the record with medical evidence sufficient to determine Plaintiff's RFC; the ALJ dismissed Plaintiff's testimony when determining her RFC because the ALJ discredited Plaintiff based on the objective medical evidence and her non-compliance with prescribed medical treatment; and the ALJ did not consider Plaintiff's daily activities in regard to his credibility determination. For the following reasons, the court finds Plaintiff's arguments

---

[1] According to https://www.nlm.nih.gov/medlineplus/ency/article/000178.htm, aortic stenosis is defined as follows:

> The aorta is the main artery that carries blood out of the heart to the rest of the body. Blood flows out of the heart and into the aorta through the aortic valve. In aortic stenosis, the aortic valve does not open fully. This decreases blood flow from the heart.

without merit and that the ALJ's decision is based on substantial evidence and is consistent with the Regulations and case law.

## A. Plaintiff's Credibility

The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including Plaintiff's RFC. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).  In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence.  Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered.").

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ reviewed the objective medical evidence of record and concluded that Plaintiff's physicians found that her condition was stable, and that, therefore, the objective medical evidence did not "correlate with [Plaintiff's] allegations and testimony at the hearing." (Tr. 13-15). "In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence," although a disability determination "cannot be made solely on the basis of objective medical evidence." Social Security Ruling (SSR) 06-7p(4), 1996 WL 374186, at *1 (July 2, 1996). Indeed, a claimant's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record." Id. at *2.

In this regard, after Plaintiff reported that she felt dizzy and weak while standing at work, Plaintiff's primary care doctor detected a heart murmur and referred her to Yousf Abduinabi, M.D., at Gateway Cardiology. Dr. Abduinabi saw Plaintiff on March 9, 2012, and reported that Plaintiff said she had shortness of breath and difficulty breathing with exertion, and that she had

no chest discomfort, palpitations, swelling, loss of consciousness, or leg pain. Dr. Abduinabi further reported that Plaintiff had non-labored breathing, clear breath sounds, and normal heart rhythms and sounds, except for a heart murmur. Dr. Abduinabi diagnosed Plaintiff with tobacco abuse, shortness of breath, and a heart murmur. Dr. Abduinabi's impression included normal left ventricular systolic function, normal right ventricular size and function, normal "four cardiac chamber size," left ventricular hypertrophy, thickened and calcified aortic valves with decreased opening, normal appearing ascending aorta and aortic arch, normal inferior vena cava, moderate to severe aortic stenosis, severe aortic insufficiency, and mild mitral regurgitation, tricuspid regurgitation, pulmonary hypertension, and pulmonic insufficiency. (Tr. 215-18).

As considered by the ALJ, a cardiac catheterization, performed on April 3, 2012, showed that Plaintiff had normal left ventricular function, but severe aortic insufficiency. Additionally, the cardiac catheterization showed that Plaintiff had normal pulmonary function. (Tr. 14, 219).

When Dr. Abduinabi saw Plaintiff, on April 18, 2012, she told Dr. Abduinabi that she was doing "ok," except for some fatigue, weakness, and dizziness. Dr. Abduinabi reported that Plaintiff had no chest discomfort suggestive of ischemia; that Plaintiff said she had no palpitations, syncope, or claudication; that Plaintiff had no transient ischemic attacks (TIA) or "stroke-like symptoms"; that Plaintiff was negative for chest pain, diaphoresis, orthopnea, palpitation, and syncope; that Plaintiff's respirations were "non-labored"; that her breath sounds were "clear throughout"; that Plaintiff had a regular cardiac rhythm; that Plaintiff had a "diastolic rumble murmur"; that, except for Plaintiff's heart murmur, review of Plaintiff's systems was normal; and that Plaintiff did not have clubbing, cyanosis, or edema in her extremities. (Tr. 213-14). On April 3, 2012, Bassam Aljoundi, M.D., referred Plaintiff for a possible aortic valve replacement, based on test results. (Tr. 219-20).

When Plaintiff presented to Melinda Peterson, D.O., on August 3, 2012, she said that she had a "hard time getting Medicaid to approve" the dental work which was a prerequisite for her recommended aortic valve replacement, but that she was having teeth removed in a few days and was on antibiotics in preparation for the procedure. Dr. Peterson told Plaintiff to avoid strenuous physical activity and extreme temperatures and to rest, and provided Plaintiff with a letter stating that her condition impaired her ability to "perform any occupational tasks." (Tr. 240-41, 334).

Plaintiff presented to Gateway Cardiology, on August 29, 2012, with shortness of breath. Liwa Younis, M.D., reported that Plaintiff was a candidate for valvular replacement, but that she first needed to have dental work completed, including that she have teeth pulled.[2] Dr. Younis noted that Plaintiff had an "active lifestyle"; that Plaintiff had "no symptoms attributable to valvular heart disease"; that echocardiography suggested moderate aortic stenosis and demonstrated severe aortic insufficiency; that Plaintiff's hypertensive heart disease was benign; and that Plaintiff's diagnosis was aortic regurgitation. (Tr. 223-24).

On November 21, 2012, Plaintiff told Jennifer Curtis, a nurse practitioner, that she was "on modified bed rest due to dizziness, [shortness of breath], and fatigue"; that she was trying to find an oral surgeon to remove teeth; and that she felt well, "with minor complaints." Nurse Curtis reported that Plaintiff said she had chest pain, which was worse at night; that Plaintiff did not have swelling in her extremities; that Plaintiff was "well-nourished" and "well-groomed"; that Plaintiff's strength and tone were "normal overall with no atrophy, spasticity or tremors"; and that Plaintiff had normal gait and station. (Tr. 238-39).

On March 7, 2013, Plaintiff reported shortness of breath with exertion, "occasional chest pressure," and "occasional dizziness." She was negative for joint pain. On examination,

_____

[2] Plaintiff states that she saw Dr. Abduinabi on this date (Doc. 14 at 3), but the record reflects that she saw Dr. Younis (Tr. 223-24).

Plaintiff's breath sounds were "clear throughout"; she had a diastolic heart murmur; she had no lower extremity edema; and her respirations were non-labored. The impression was severe aortic insufficiency, with no signs or symptoms of congestive heart failure. (Tr. 227-28). Upon examination, on March 15, 2013, Anil Gupta, M.D., reported that Plaintiff had no edema in her lower extremities; that she was "well-nourished and well-groomed"; that her "strength and tone [were] normal overall with no atrophy, spasticity or tremors"; and that Plaintiff had normal gait and station. Also on this date, Dr. Gupta provided Plaintiff with a note stating that she required dental work in order to have "pre-op clearance for AVR." (Tr. 236-37).

When Plaintiff presented, on July 8, 2013, for an annual examination, Nurse Practitioner Michelle Marcus reported that Plaintiff felt "well with minor complaints," and that Plaintiff had normal breath sounds, gait, station, and posture and regular heart rhythm and breath sounds. (Tr. 280-81). When Plaintiff presented to Nurse Practitioner Marcus, on August 9, 2013, it was noted that Plaintiff was "[n]ot in acute distress"; that she was well nourished; that she had normal posture and gait; and that her pain level was "0/10." (Tr. 274).

The last treatment note of record, dated August 12, 2013, reflects that Plaintiff denied edema; that she had no chest discomfort suggestive of ischemia; that Plaintiff had "no symptoms attributable to valvular heart disease"; that Plaintiff was negative for lower extremity clubbing, cyanosis, and edema; that Plaintiff had a normal gait; and that she was negative for joint pain and "dizziness." (Tr. 263-64).

To the extent Plaintiff argues that substantial evidence does not support the ALJ's determination that the objective medical evidence was inconsistent with Plaintiff's allegations regarding the severity of her conditions, the court finds, based on the foregoing evidence, that the

ALJ's determination, in this regard, is based on substantial evidence and is consistent with the Regulations and case law.

Second, the ALJ considered that Plaintiff was non-compliant with recommended medical treatment. See Wright v. Colvin, 789 F.3d 847, 854 (8th Cir. 2015) (affirming where ALJ found that the claimant's "credibility suffered from his refusal to take pain medication and his refusal to seek out even conservative treatments such as physical therapy"); Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (noncompliance is a basis for discrediting a claimant; when claimant was compliant with dietary recommendations his pain was under good control; claimant's noncompliance with a diet regimen prescribed by his doctor contributed to a negative credibility determination).

In regard to Plaintiff's non-compliance, the ALJ considered that the record indicated that Plaintiff had not kept dental appointments necessary for her to have the recommended heart valve surgery and that, at the hearing, "she did not offer any convincing reasons why [the recommended surgery] had not yet been performed." (Tr. 14-15). In particular, as considered by the ALJ, Plaintiff's medical providers diagnosed her heart condition and recommended surgery to correct this condition in April 2012, but that, at the time of the October 2013 hearing, Plaintiff had not completed the required dental work and had recently stopped smoking. (Tr. 46-49).

Plaintiff acknowledged at the hearing that her doctors wanted her to have stopped smoking "for a nice little length of time before [she] had [] the surgery." She also testified that she was still waiting for "the dental work to go through" and that she had "been checking with a lot of different places that [could] finish up [her] dental work. Plaintiff additionally testified that she stopped smoking sometime after August 12, 2013, at which time she was still smoking a half package of cigarettes a day. (Tr. 35-36, 263).

Additionally, the record reflects that Dr. Abduinabi counseled Plaintiff on smoking cessation when he first saw her, in March 2012, and again in April 2012. (Tr. 214, 218). Dr. Peterson counseled Plaintiff to stop smoking in August 2012. (241). On August 29, 2012, Dr. Younis noted that Plaintiff had begun the recommended dental work, and suggested that she accelerate it and also counseled Plaintiff to stop smoking. (Tr. 224). Records from Gateway Cardiology, dated December 3, 2012, reflect that Plaintiff needed "to have AVR," but that she did "not keep appt. with dental clinic to have teeth pulled prior to surgery." (Tr. 225).

Dr. Gupta reported, on March 7, 2013, that Plaintiff needed to have three teeth pulled in order for her to have surgery, and that Plaintiff said she had a dental appointment on March 19, 2013, but noted that Plaintiff had "been non-compliant," in that she did not get a recommended electrocardiogram (EKG) in November 2012. (Tr. 236). Also, Nizar Assi, M.D., reported, on March 7, 2013, that he "highlighted the importance of [Plaintiff's] finishing her dental work ASAP so she [could] proceed with AVR." Dr. Assi also instructed Plaintiff "on tobacco cessation." (Tr. 228). Also, when Plaintiff presented, on August 9, 2013, requesting that Nurse Practitioner Marcus complete a disability form, Nurse Practitioner Marcus refused to do so, and noted that Plaintiff had a "strong smell of tobacco on her clothing," and that, although Dr. Gupta ordered an EKG for Plaintiff, she "refused to wait to have this performed and [had] not returned." (Tr. 274). Finally, in the last medical note in the record, dated August 12, 2013, it was reported that Plaintiff smoked a half package of cigarettes a day; that she needed to have her "teeth problems addressed prior to surgical intervention (AVR)"; that she had an appointment with a dental clinic; and that she would "need [to] follow up with CTS for AVR." (Tr. 263-64).

To the extent Plaintiff contends, based on Social Security Ruling (SSR) 82-59, 1982 WL 21384 (1982), the ALJ improperly considered Plaintiff's non-compliance when determining that

her allegations were not fully credible (Doc. 14 at 10), SSR 82-59 "only applies to claimants who would otherwise be disabled within the meaning of the Act; it does not restrict the use of evidence of noncompliance for the disability hearing." Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). "An ALJ may properly analyze[] the evidence of [a claimant's] noncompliance within the context of his analysis of [the claimant's] credibility." Id. SSR 82-59 prohibits consideration of a claimant's non-compliance only where the claimant would otherwise be found disabled.

The ALJ in this matter never determined that Plaintiff was disabled and that compliance would restore her ability to work. (Tr. 15). Rather, the ALJ considered Plaintiff's symptoms and limitations as they were without the surgery and determined the extent to which they would limit her engaging in work activities. (Tr. 15). Thus, the "ALJ used the evidence of [Plaintiff's] noncompliance solely to weigh the credibility of [Plaintiff's] subjective claims of pain." Holley, 253 F.3d at 1092. The court finds, therefore, that SSR 82-59 does not apply in this case, and that Plaintiff's contention to the contrary is without merit. Plaintiff's non-compliance, moreover, was just one of several factors considered by the ALJ when determining Plaintiff's credibility.

Third, the ALJ considered that Plaintiff's heart condition was not so severe that it required immediate surgery; rather, Plaintiff's doctors delayed the procedure until she could obtain dental treatment. (Tr. 15).

Fourth, the court notes that Plaintiff's blood pressure was controlled with medication. Conditions which can be controlled by treatment are not disabling. See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)). Notably, on March 9, 2012, Dr. Abduinabi prescribed medication for Plaintiff's blood pressure, which was 162/88. (Tr. 217-18). On April 18, 2012, Plaintiff's blood pressure was 124/80. (Tr.

214). Description of High Blood Pressure, http://www.nhlbi.nih.gov/health/health-topics/topics/hbp (last visited May 4, 2016) ("Normal blood pressure for adults is defined as a systolic pressure [top number] below 120 mmHG and a diastolic pressure [bottom number] below 80 mmHG."). In November 2012, Plaintiff reported that her medications did not have side effects. (Tr. 238). See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [the claimant's] having side effects from any medication."). In August 12, 2013, Plaintiff's blood pressure was 122/70, and it was reported that it was controlled "on medical therapy." (Tr. 264).

Fifth, the ALJ considered that no *treating* source, other than Dr. Peterson, issued a medical statement assessing Plaintiff's limitations. (Tr. 15). See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work.") (citing Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir.1996)). See also Eichelberger, 390 F.3d at 590 (ALJ could find claimant not credible based in part on fact that no physician imposed any work related restrictions).

Indeed, on August 3, 2012, Dr. Peterson recommended that Plaintiff avoid strenuous tasks, rest, and avoid extreme temperatures. As stated above, Dr. Peterson also wrote a letter, on this same date, stating that Plaintiff had a "serious medical condition which completely impair[ed] her ability to perform any occupational tasks." (Tr. 241, 334). However, the record does not reflect that Dr. Peterson saw Plaintiff other than on the one day that she wrote the letter. 20 C.F.R. §§ 404.1527(d)(2)(i) & 416.927(d)(2)(i) ("Generally, the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the

more weight [the Commissioner] will give to the source's medical opinion."). Further, as stated above, no other physician who saw Plaintiff made suggestions similar to Dr. Peterson's. In any case, the ALJ's limiting Plaintiff to sedentary work was consistent with Dr. Peterson's clinical notes stating that Plaintiff should refrain from strenuous physical activity.[3]

Plaintiff stated in an undated Missouri Supplemental Questionnaire that her doctor told her that "it [would] be a long time before [she] [was] able to lift. [She] would have to take blood thinners for the rest of [her] life. They [] also told [her] that they think [she] may never be able to return to work."[4] (Tr. 167). However, other than the above described letter from Dr. Peterson, the record does not include any documentation of Plaintiff's statements in the Missouri Supplemental Questionnaire.

Notably, as stated above, on August 9, 2012, Plaintiff asked Nurse Practitioner Marcus to sign a disability form. In particular, Plaintiff asked her to sign "one [form] for disability and another for not having worked for a year." Plaintiff told Nurse Practitioner Marcus that her cardiologist said she was "too sick to do any work at all"; she could not "do anything because of [her] aortic stenosis." Nurse Practitioner Marcus noted that Plaintiff did not have documentation with her from her cardiologist; that Plaintiff stated that "it [did not] matter"; and that Plaintiff would not tell her the name of her cardiologist. (Tr. 274). Accordingly, Nurse Practitioner Marcus did not complete the form.

Sixth, although Plaintiff argues that the ALJ did not consider her daily activities (Doc. 14 at 14-15), the ALJ questioned Plaintiff extensively, at the administrative hearing, regarding her

_____

[3] 20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

[4] Based on its position in the Administrative Record, the Questionnaire was likely completed on the same day Plaintiff completed a Function Report – Adult, which was May 24, 2012.

daily activities, and, in his written decision, he acknowledged Plaintiff's testimony that she said she had difficulty walking up a flight of stairs; that she could not go "shopping anymore"; and that she could not lift ten pounds because "she struggle[d] to catch her breath." (Tr. 13, 32-35). To the extent that the ALJ did not discuss Plaintiff's daily activities in greater depth in his decision, the ALJ's failure to do so does not mean that the ALJ did not consider Plaintiff's assertions regarding her daily activities in their entirety. See Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (while ALJ "was required to develop the record fully, she was not required to provide an in-depth analysis on each piece of evidence"); Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

Moreover, as discussed above, an ALJ is not required to address every Polaski factor if the factors are acknowledged and examined prior to making a credibility determination. See Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"). As set forth above, upon finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] [alleged] symptoms [were] not entirely credible, the ALJ considered the medical evidence including doctors' notes and objective test results, Plaintiff's non-compliance, the fact that no surgery had actually been scheduled although it was recommended, and Plaintiff's failure to "offer any convincing reasons why [the recommended] procedures had not yet been performed" did not support Plaintiff's allegations. Based on these factors the ALJ found Plaintiff not fully credible. (Tr. 14-15). The court finds,

therefore, that the ALJ adequately explained the reasons he did not fully credit Plaintiff's allegations regarding the severity of her conditions. See Lowe, 226 F.3d at 972; Tucker, 363 F.3d at 783.

In any case, the court notes that Plaintiff stated in a Function Report – Adult that she took a shower in the morning; that the shower took her an hour; that for "most of the day" she had to lie down; and that she remained "bed bound daily." However, she also reported in the Function Report – Adult that she took care of her two children; that she cooked; that she did laundry, that she took care of her home; that she could drive but that it was unsafe for her to do so; that she shopped in stores for food, personal needs, and household supplies; that she could pay bills, handle a savings account, count change, and use a checkbook; that she read and watched television on a daily basis "with no problem"; that she spent times with others on a daily basis; that she did not need someone to accompany her when she went places; and that her disabling conditions did not affect her ability to sit, talk, hear, see, remember, concentrate, understand, follow instructions, use her hands, or get along with others. (Tr. 157-62). Plaintiff also stated in an undated Missouri Supplemental Questionnaire that she played video games, puzzles, or used a computer thirty minutes at a time. (Tr. 166). See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (ALJ properly discounted plaintiff's credibility where, among other factors, plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, tak[ing] care of his dogs, us[ing] a computer, driv[ing] with a neck brace, and shop[ping] for groceries with the use of an electric cart"). Thus, to the extent the ALJ did not specifically address Plaintiff's daily activities, the court finds that the ALJ's failure to do so did not affect the outcome of his decision. See Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("There is no indication that the ALJ would have decided differently had he read the hand-written notation

to say 'walk' rather than 'work' and any error by the ALJ was therefore harmless."); Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion does not require reversal, because the record supports her overall conclusion."). As such, the court finds that Plaintiff's argument that the ALJ's decision is not based on substantial evidence because he failed to consider her daily activities is without merit.

In conclusion, the court finds that the ALJ's credibility determination is based on substantial evidence and consistent with the Regulations and case law.

**B.      Plaintiff's RFC**

The Regulations define RFC as "what [the claimant] can do" despite her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker, 363 F.3d at 783 (quoting McKinney, 228 F.3d at 863). See also Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013).

To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified, in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per

curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

As previously discussed, the ALJ found that Plaintiff had the RFC to perform sedentary work. 20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Indeed, SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. … If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996)). Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day." Id. at 997 (citing 1996 WL 374185 at *7).

First, the court notes that to prove disability the evidence must establish functional limitations, not just medical diagnosis. See 20 C.F.R. §§ 404.1545(e), 416.945(e); Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis . . ., of course, says nothing about the severity of the condition."). Thus, Plaintiff was not disabled merely because she had been diagnosed with a heart murmur and aortic insufficiency. Further, as discussed above in regard to Plaintiff's credibility, Dr. Peterson was the only medical source of record to limit Plaintiff's functional limitations, and she did this after seeing Plaintiff only once. Notably, on examination of Plaintiff, Dr. Peterson found Plaintiff had no upper or lower extremity edema or digital clubbing. (Tr. 240). See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). In any case, the ALJ's limiting Plaintiff to sedentary work accommodated Dr. Peterson's opinion that Plaintiff should avoid strenuous activity as sedentary work precluded Plaintiff from frequently lifting more than ten pounds and only occasionally lifting no more than twenty pounds. See 20 C.F.R. § 404.1567(a). To the extent Dr. Peterson opined without explanation, in her April 2012 letter, that Plaintiff could not work at all, an unsupported conclusory statement by a physician that a claimant cannot work is not binding on the Commissioner. See Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ was permitted to disregard treating doctor's conclusory statement, unsupported by the objective medical evidence, that claimant was disabled); Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.").

Further, as discussed above in regard to Plaintiff's credibility, it was reported, by Plaintiff's treating doctors and medical providers, that Plaintiff's condition was stable; that her

need for surgery was not immediate; that she maintained an active lifestyle; that Plaintiff had no symptoms attributable to valvular heart disease; that Plaintiff was negative for joint pain and edema in her extremities; that she had normal strength, gait, and station; and that Plaintiff was not in acute distress. (Tr. 213-15, 218, 223-24, 228, 236-37, 263-65, 274, 280-81). Notably, since Plaintiff's diagnosis of aortic insufficiency and a heart murmur, she was never hospitalized. When formulating Plaintiff's RFC, the ALJ accommodated Plaintiff's limitations, to the extent he found them credible, including Plaintiff's assertions regarding her dizziness and weakness. Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record."). Significantly, Plaintiff acknowledged at the hearing that she had not had any "per se sit-down jobs" and that the "strain of actually being up and [] having to move around [] is what she[] was concerned about."[5] (Tr. 31).

To the extent Plaintiff argues that the ALJ did not include a narrative statement connecting his RFC findings to the medical evidence (Doc. 14 at 6, 10-11), Plaintiff is mistaken. Her argument is without merit and belied by the text of the ALJ's written opinion. Prior to determining Plaintiff's RFC, the ALJ engaged in a lengthy narrative discussion of the relevant medical evidence of record. (Tr. 14-15). Only after doing so, in conjunction with his finding Plaintiff not fully credible, did the ALJ conclude that her symptoms, including shortness of breath, dizziness, or chest pain, would be accommodated by sedentary work, which would limit the extent to which Plaintiff would have to stand, walk, and lift. (Tr. 15). See Wiese v. Astrue, 552 F.3d 728, 734 (8th Cir. 2009) ("Indeed, the ALJ wrote nearly four full pages of analysis regarding the consistency between Wiese's self-reports contained in the record, her treating

_____

[5]  It is not clear from the context of this testimony whether Plaintiff meant to say that it was her concern or that of someone else's.

physicians' notes and assessments, the medical evidence and the hearing testimony. In doing so, the ALJ provided a thorough analysis of the inconsistencies he noted in the record. In any case, an ALJ is not required to list each function which he includes in a claimant's RFC, followed by the specific medical evidence which supports a finding that the claimant can engage in that function. See Davis v. Colvin, 2015 WL 1964791, at *5 (W.D. Mo. May 1, 2015) ("SSR 96–8P does not require an ALJ to list each RFC limitation followed by the specific evidence that supports it; such a requirement would undermine the "all relevant evidence" standard and would result in duplicative discussions of the same evidence.").

Indeed, Plaintiff's questioning the ALJ's judgment that the evidence is insufficient to establish disability does not establish a basis upon which the ALJ's decision should be reversed and remanded. See Goff, 421 F.3d at 789 ("An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

In conclusion, the court that the ALJ's RFC determination is consistent with the relevant evidence of record including the objective medical evidence, the observations of medical providers, and diagnostic test results, as well as Plaintiff's credible limitations; that the ALJ's RFC determination is based on substantial evidence; and that Plaintiff's arguments to the contrary are without merit.

**IV.**
**CONCLUSION**

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint (Docs. 1, 14) is **DENIED** and Plaintiff's case is **DISMISSED, with prejudice.**

A separate judgment shall be entered incorporating this Memorandum and Order.

Dated this 6th day of June, 2016.

/s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE
